Opinion filed July 2, 2026



In The

# Eleventh Court of Appeals

_____

## No. 11-25-00081-CV
_____

**RANDAL KINNIBRUGH AND BEVERLY KINNIBRUGH, Appellants**

**V.**

**LINDA S. POTEET, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARY OF THE ESTATE OF RICHARD D. POTEET, DECEASED, Appellee**

**On Appeal from the 50th District Court**

**Knox County, Texas**

**Trial Court Cause No. 10374**

## O P I N I O N

In this permissive interlocutory appeal, we construe, as a matter of first impression, pertinent provisions of the Liability Arising from Farm Animals Act (the Act) and its applicability to the claims asserted by Appellee, Linda S. Poteet, for the

tragic accidental death of her husband, Richard D. Poteet.[1] TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014(d), 87.001–.005 (West 2017 & Supp. 2025).

Richard's death was the result of a workplace accident that involved a hydraulic cattle chute operated by Kyle Kinnibrugh, the son and employee of Appellants, Randal and Beverly Kinnibrugh. The Kinnibrughs filed a combined traditional and no-evidence motion for summary judgment. After a hearing, the trial court denied the motion on both grounds and found that the Act did not apply because Richard's accidental death was not caused "directly" by the actions of a farm animal. On appeal, the Kinnibrughs request that we reverse the trial court's rulings and render judgment in their favor. By a cross-point, contingent on our reversal of the trial court's rulings, Linda contends that the Act violates the open courts guarantee of Article I, Section 13 of the Texas constitution. *See* TEX. CONST. art. I, § 13.

Because we conclude that (1) the Act applies here, (2) the Act is not unconstitutional, and (3) no exception to the Act's liability bar applies, we reverse the order of the trial court and render judgment in favor of the Kinnibrughs.

I. *Factual Background*

The Kinnibrughs own and raise cattle, and Richard and Kyle worked for them as ranch hands. Richard was an experienced ranch hand and had worked for the Kinnibrughs for eleven years prior to his death. The accident in question occurred when Richard, Kyle, and Randal were vaccinating cows owned by the Kinnibrughs. To administer the vaccines, they secured each cow into a hydraulic squeeze chute. During the vaccination process, Kyle operated levers on one side of the chute that opened the side panels and the gates at the front and back of the chute while Richard administered the vaccines to the cows on the other side of the chute. When deposed,

---

[1]In an order dated April 17, 2025, we determined that the permissive appeal requirements of Section 51.014(d) were met. TEX. R. APP. P. 28.3.

Kyle testified that this was the standard procedure that he and Richard always followed, and that Kyle had operated the chute in this manner "thousands" of times. On this day, Randal loaded the cows into the chute through the back gate; he did not see the accident occur because the chute could not be seen from where he was standing.

Kyle and Randal testified that cows will occasionally "go down" or stumble when they enter the chute. This can cause the front gate of the chute to close around their necks in the incorrect position and in turn cut off the blood supply to their brains. If this occurs, injury or death to a cow can occur if the chute's side panels are not released. To remedy this, the chute operator must release the chute so that the cow can be freed and allowed to stand up. Kyle and Randal testified that "everyone," including Richard, knew the dangers involved with the operation of the hydraulic chute, and that its moving parts and pinch points could cause serious injury or death if one is not clear of the chute when it is released.

Unfortunately, this dilemma arose with the final cow to be vaccinated that day. Kyle and Randal testified that they heard Richard yell "[l]et him up," which, based on their routine and having worked together for several years, they understood to mean that Richard was clear of the chute and to release the side panels so the cow could stand up. Kyle then released the chute without verifying whether Richard was clear of the chute. Tragically, he was not, and he died when his head was crushed by the released side panels of the hydraulic chute.

As Richard's surviving spouse, Linda filed a wrongful death action against the Kinnibrughs, alleging that they bore vicarious liability for Kyle's conduct; Linda also asserted claims for negligence, gross negligence, and exemplary damages. *See* CIV. PRAC. & REM. §§ 41.003 (West 2015), 71.002–.004 (West 2008). The Kinnibrughs answered and alleged that the Act barred Linda's claims; they later moved for summary judgment on traditional and no-evidence grounds on that basis,

and because no evidence supported her gross negligence claim. After a hearing, the trial court denied the Kinnibrughs' motion and found that the Act does not apply in cases such as this one "where the death was not caused directly by the actions of an animal." The trial court also certified a permissive appeal of its rulings because (1) its order involves a controlling question of law and a matter of first impression—whether Chapter 87 of the Civil Practice and Remedies Code (the Act) applies in cases like this one—about which there is substantial ground for difference of opinion, and (2) an immediate appeal may materially advance the ultimate termination of this litigation. *See* CIV. PRAC. & REM. § 51.014(d); TEX. R. CIV. P. 168.

## II. *Standard of Review*

We review summary judgment orders de novo. *Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 717 (Tex. 2024); *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021). To prevail under the traditional summary judgment standard, the movant has the burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c);[2] *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018). If the movant meets its summary judgment burden, the burden shifts to the nonmovant to raise a genuine issue of material fact that would preclude the grant of summary judgment. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 510–11 (Tex. 2014).

---

[2]The supreme court recently revised Rule 166a. Although the "rewrite is not intended to substantively change the law," it has resulted in a renumbering of the rule's provisions. *See* Final Approval of Amendments to Rule 166a of the Texas Rules of Civil Procedure; Misc. Docket No. 26-9012 (Tex. Feb. 27, 2026). The amendments to this rule only apply to motions for summary judgment filed on or after March 1, 2026. Because Appellants' motions were filed prior to that date, we refer to the rule in effect at the time the motions were filed. *See id.*

To determine if a genuine issue of material fact exists, we review the evidence in the light most favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019). We credit evidence that is favorable to the nonmovant if reasonable jurors could do so, and we disregard contrary evidence unless reasonable jurors could not. *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The evidence raises a genuine issue of material fact if reasonable and fair-minded jurors could differ in their conclusions considering all the summary judgment evidence presented. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

Generally, when parties move for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion. *KMS Retail*, 593 S.W.3d at 181. If the nonmovant fails to overcome its no-evidence burden on any claim, we need not address the traditional motion to the extent that it addresses the same claim. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). We review a no-evidence motion for summary judgment under the same legal sufficiency standard that we use when reviewing the grant of a directed verdict. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). To defeat a no-evidence motion, the nonmovant must produce more than a scintilla of evidence that raises a genuine issue of material fact as to the challenged elements of the asserted cause of action. *KMS Retail*, 593 S.W.3d at 181; *see* Tex. R. Civ. P. 166a(i). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Lozada v. Posada*, 718 S.W.3d 262, 266–67 (Tex. 2025) (quoting *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)). "More than a scintilla of evidence exists when

5

the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.*

### III. *Analysis*

#### A. *Statutory Construction Principles*

Our primary objective when construing a statute is to ascertain and give effect to the Legislature's intent. *Lone Star Well Serv. LLC v. RMTDC Ops.*, 731 S.W.3d 93, 102 (Tex. App.—Eastland 2026, no pet.) (citing *City of Stephenville v. Belew*, 692 S.W.3d 347, 362 (Tex. App.—Eastland 2024, pet. denied)); *see TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011).

We begin by examining the plain meaning of the statute's language. *Lone Star*, 731 S.W.3d at 102; *see Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389–90 (Tex. 2014). We derive legislative intent from considering the statute as a whole rather than only from isolated portions of it. *Lone Star*, 731 S.W.3d at 102; *see City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). That is, we read statutes contextually to give effect to every word, clause, and sentence because every word and phrase is presumed to have been used intentionally, with a meaning and a purpose. *Lone Star*, 731 S.W.3d at 102; *see Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018).

If the statute is clear and unambiguous, we must read the language according to its common meaning "without resort to rules of construction or extrinsic aids." *Belew*, 692 S.W.3d at 362 (quoting *Crosstex Energy Servs.*, 430 S.W.3d at 389); *but see* TEX. GOV'T CODE ANN. § 311.023 (West 2013) (permitting the consideration of legislative history and other construction aids regardless of ambiguity). In that regard, we adopt the interpretation that is supported by the statute's plain language unless such an interpretation would yield an absurd result. *TGS-NOPEC*, 340 S.W.3d at 439 (citing *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care*, 145 S.W.3d 170, 177 (Tex. 2004)). Conversely, a statute is ambiguous if its

language is susceptible to two or more reasonable interpretations and the legislative intent cannot be discerned from the statute's language alone. *Fort Worth Transp. Auth.*, 547 S.W.3d at 838.

B. *Relevant Provisions of the Act*

As relevant here,[3] the Act provides that, subject to certain exceptions, all persons, including a farm owner, lessee, or livestock producer, are not liable for the death of a participant in a farm animal activity if the participant's death results from the dangers or conditions that are an inherent risk of a farm animal, a farm animal activity, or the raising or handling of livestock on a farm, including:

> (1) the propensity of a farm animal or livestock animal to behave in ways that may result in personal injury or death to a person on the animal, handling the animal, or otherwise around the animal;
>
> (2) the unpredictability of a farm animal's or livestock animal's reaction to sound, a sudden movement, or an unfamiliar object, person, or other animal;
>
> . . .
>
> (4) a collision with another animal or an object; or
>
> (5) the potential of a participant to act in a negligent manner that may contribute to injury to the participant or another, including failing to maintain control over a farm animal or livestock animal or not acting within the participant's ability.

CIV. PRAC. & REM. § 87.003. The above examples of "inherent risk[s]" are illustrative and non-exclusive. *See Loftin v. Lee*, 341 S.W.3d 352, 354, 356 (Tex. 2011); *Wilde v. San Angelo Stock Show & Rodeo Ass'n, Inc.*, 728 S.W.3d 342, 347 (Tex. App.—Amarillo 2025, no pet.).

Section 87.004 of the Act enumerates six exceptions to this limitation on liability, but here, the parties focus solely on the exception stated in subsection (4),

---

[3]For convenience, we exclude the Act's references to livestock shows and Section 87.003(3), which relates only to farm animal activities that involve equine animals.

which provides a basis for liability when a person "committed an act or omission with *wilful or wanton disregard* for the safety of the participant and that act or omission caused the injury." CIV. PRAC. & REM. § 87.004(4) (emphasis added). The Act further defines eleven categories of "farm animal activities," including the "daily care" involved in owning and raising a farm animal, "assisting in or providing animal health management activities, including vaccination," and "assisting in or conducting customary tasks on a farm concerning farm animals." *Id.* § 87.001(3)(C), (H), (I). "[V]accinating" and the "engagement in routine or customary activities on a farm to handle and manage farm animals" are also expressly included in the Act's definition of the phrase "Engages in a farm animal activity." *Id.* § 87.001(1).

C. *The Act Applies to These Circumstances*

The trial court determined that Chapter 87 does not apply to the circumstances of this case because "the death was not caused directly by the actions of an animal." However, the plain and unambiguous text of the controlling statute conflicts with and is contrary to the trial court's ruling.[4]

Section 87.003 is phrased in the disjunctive; that is, the enumerated inherent risks are clearly stated and listed in separate and distinct categories. *See MBank Abilene, N.A. v. Westwood Energy, Inc.*, 723 S.W.2d 246, 251 (Tex. App.—Eastland 1986, no pet.) (The general rule of statutory construction is that the words "and" and "or" are not interchangeable. (citing *Bd. of Ins. Comm'rs of Tex. v. Guardian Life Ins. Co. of Tex.*, 180 S.W.2d 906, 908 (Tex. 1944))); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives.").

---

[4]Linda relies heavily on the legislative history of the most recent amendments to the Act in support of her proposition that the Act was never intended to apply when an animal did not directly cause the harm. But, as we explain, the plain and unambiguous meaning of the statutory text and the supreme court's interpretation of it does not support this reading.

So, despite the trial court's ruling, the statutory text clearly encompasses the separate and distinct risks that are inherent in "a farm animal activity" and the "raising and handling of livestock on a farm," in addition to those that are simply associated with "a farm animal." CIV. PRAC. & REM. § 87.003. Moreover, the Texas Supreme Court has held that the statutory text "reflects an expansive view of 'inherent risk,'" one that encompasses both the activity *of* farm animals as well as an activity *involving* farm animals. *See Loftin*, 341 S.W.3d at 354, 356–57 ("[A]n inherent risk is one that, in its general character, is associated with activities *involving* [farm] animals.") (emphasis added).[5]

It is significant that the Act provides protection against both the unavoidable outcomes or consequences of animal behavior and the risks that are "directly related" to organizing and conducting activities that involve farm animals and livestock. *Loftin*, 341 S.W.3d at 358; *see Wilde*, 728 S.W.3d at 346 ("[T]he text protects against risks flowing from the organizing and conduct of activities involving [farm animals], not merely risks from animal behavior itself."). In this regard, the court further stated that "determining what risks are inherent should be based on a common-sense understanding of the nature of [farm animal] activities." *Loftin*, 341 S.W.3d at 358.

To illustrate this point, the court in *Loftin* compared two hypothetical scenarios. First, if the participant was injured because she was struck by a vehicle that was operated by another person while she was waiting by the stables to embark on a trail ride, the driver's liability would not be limited by the Act because the

_____

[5]In *Loftin*, the court construed a prior version of the statute that applied only to equines. *See Loftin*, 341 S.W.3d 354–60; Act of May 22, 2001, 77th Leg., R.S., ch. 1108, §§ 2–4, 2001 Tex. Gen. Laws 2457, 2457–59. Subsequent amendments expanded the Act's scope to include bovines and other "farm animal[s]." *See* Act of May 25, 2011, 82nd Leg., R.S., ch. 896, § 2, 2011 Tex. Gen. Laws 2288, 2288. Because nothing in the court's reasoning in *Loftin* concerning the scope of the statute's inherent risks is affected by the expansion of the statute's scope and application to *other farm animals*, we conclude that the reasoning in *Loftin* also extends to them. *See Wilde*, 728 S.W.3d at 346–47 (relying on *Loftin* after the statute was expanded to apply to other farm animals, although the animal in that case was an equine).

accident would have been "wholly unrelated" to any farm animal activity. *Id.* On the other hand, if the participant was "struck by a horse trailer while unloading the horse she was to ride on the trail, her injury would have resulted from a risk inherent in [a farm animal] activity because the two were directly related."[6] *Id.*

In *Wilde*, a rider was injured during a match race when her horse was forced to veer to the left to avoid a fence that was located just past the finish line, causing her to be ejected from the horse's saddle and into the fence. *Wilde*, 728 S.W.3d at 344. The rider sued the race's sponsor for creating a dangerous condition by placing the fence too close to the finish line without providing adequate room for a rider to stop or turn. *Id.* Relying on *Loftin*, the court in *Wilde* held:

> Her injury involved the propensity of horses to behave in ways that can unseat riders; including the unpredictability of a horse's reaction to nearby objects. . . . Additionally, the confined arena with horses sprinting at high speeds toward physical boundaries is inherent when match racing in an enclosed space. The fence here was not coincidentally present during Wilde's race. It defined the arena where the race occurred. One cannot have an "enclosed" area without enclosures. Just as trailers are integral to trail riding in *Loftin*, fences and other barriers are a part of activities, including racing, when they occur in enclosed arenas.

*Id.* at 347.

The circumstances of the case before us fall squarely within these parameters. It is undisputed that the Kinnibrughs are "farm owners or lessees" as well as "livestock producers" within the meaning of the Act. *See* Civ. Prac. & Rem. §§ 87.001(2-a)–(2-b)(B), .001(6)–(6-a), .003. Likewise, as employees of the Kinnibrughs, Richard and Kyle each were a "participant." Civ. Prac. & Rem.

---

[6]Linda asserts that every case concerning the Act's interpretation involved a circumstance whereby an animal *directly* injured someone. Even if this is true, this does not change the meaning of the Act's plain and unambiguous text. *See Loftin*, 341 S.W.3d at 358. The *Loftin* court's hypothetical scenario itself concerned an injury to a person that was caused by farm equipment—a horse trailer—that was "directly related" to the farm animal activity, rather than the horse itself. *Id.*

§ 87.001(9)(A). Richard and Kyle were engaged in vaccinating cattle, *see id.* § 87.001(2-b)(B) (a "[f]arm animal" includes a bovine), which Section 87.001 expressly and repeatedly defines as a "farm animal activity." CIV. PRAC. & REM. § 87.001(1), (3)(H).

Here, Richard's tragic death was neither a coincidence nor unrelated to the vaccination process. *See Loftin*, 341 S.W.3d at 358 ("An unrelated risk, one that occurs during the activity simply by coincidence, is not inherent in the activity."); *Wilde*, 728 S.W.3d at 347. Kyle testified that the hydraulic squeeze chute was the routine, customary method that Richard and Kyle used to vaccinate cattle, and that they had followed the same procedure in operating the chute "thousands" of times before. According to Randal and Kyle, Richard, an experienced ranch hand, was aware of the dangers, such as pinch points, that are associated with the operation of the hydraulic chute. They also testified that sometimes a cow would "go down" or stumble in the chute in a way that would cause the chute to choke it, and that this necessitated releasing the chute to reposition the cow. *See* CIV. PRAC. & REM. § 87.003(1) ("[T]he propensity of a farm animal or livestock animal to behave in ways that may result in personal injury or death to a person on the animal, handling the animal, or otherwise around the animal.").

Indeed, the final cow to be vaccinated that day "went down" and presumably began to choke or at least was improperly positioned. *See* CIV. PRAC. & REM. § 87.003(2) ("the unpredictability of a farm animal's or livestock animal's reaction to sound, a sudden movement, or an unfamiliar object, person, or other animal"). In reaction to this, and according to Randal and Kyle's testimony, Richard called out to "let [the cow] up"; Kyle then released the chute. *Cf. Loftin*, 341 S.W.3d at 358 ("[H]ad Loftin accidentally driven a vehicle into Lee while she was waiting by the stables to embark on the trail ride, Loftin's liability would not be limited by [S]ection 87.003."). Kyle did not check to see whether Richard was clear of the

11

chute before releasing it. *See* Civ. Prac. & Rem. § 87.003(5) ("the potential of a participant to act in a *negligent* manner that may contribute to injury to the participant or another") (emphasis added). However, Richard was not clear of the chute, and he was killed when it struck him. *See id.* § 87.003(4); *Wilde*, 728 S.W.3d at 346–47; *Little v. Needham*, 236 S.W.3d 328, 332 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (recognizing that horses veer unpredictably and that collisions with objects near riding areas represent inherent risks).

These circumstances fit precisely within all four of the relevant non-exclusive factors enumerated in Section 87.003. Civ. Prac. & Rem. § 87.003. In this instance, the dangers and conditions posed by operating the hydraulic squeeze chute— including the risk of injury or death from being crushed in the pinch points of the machine—were, like the horse trailer hypothetical noted in *Loftin*, directly related to the process of vaccinating cattle. *See Loftin*, 341 S.W.3d at 358. Thus, we conclude that the Act applies to this case and that, unless Linda could establish the application of an exception to the Act's liability bar, no liability would attach to the Kinnibrughs as a matter of law. *See* Civ. Prac. & Rem. §§ 87.003, .004; *Loftin*, 341 S.W.3d at 358; *Wilde*, 728 S.W.3d at 346–47.

D. *The Remaining Issues Are Fairly Included Subsidiary Issues*

"Once a trial court has authorized a permissive appeal that an appellate court accepts, the appellate court should resolve the appeal 'according to the same principles as any other appeal, including addressing all fairly included subsidiary issues and ancillary issues pertinent to resolving the controlling legal issue.'" *Boren Descendants v. Fasken Oil & Ranch, Ltd.*, No. 25-0010, 2026 WL 1108688, at *2 (Tex. Apr. 24, 2026) (quoting *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 147 (Tex. 2022)). "That principle applies because it is the *order* that is reviewed on appeal, 'and the rules of appellate procedure preclude a strict construction of issues presented on appeal.'" *Id.*

12

The trial court's order denied the Kinnibrughs' motion for summary judgment on both grounds and additionally recited that the Act does not apply to this case. Although we have answered the primary question presented in this appeal—that the Act does apply here—subsidiary issues remain. Linda advances a contingent, constitutional challenge to the Act, and has raised the issue of whether an exception to the Act's bar on liability operates to nevertheless permit liability under these circumstances, which are "fairly included subsidiary issues . . . pertinent to resolving the controlling legal issue." *Id.* Similarly, the trial court's order also addressed Linda's gross negligence claim which, as we explain below, is intertwined with the question of whether a statutory exception to the Act's limitation of liability applies and therefore is also a "fairly included subsidiary issue[]." *See id.* Therefore, we must address each of these questions before resolving this permissive appeal. *Id.*

E. *Linda's Open Courts Constitutional Challenge Fails*

By a cross-point, Linda asserts that, if we hold that the Act applies here, it violates the open courts provision of the Texas constitution. *See Waak v. Rodriguez*, 603 S.W.3d 103, 111 (Tex. 2020) (suggesting that the Act's application to ranch hands could, for those employed by nonsubscribers to workers' compensation insurance, like the Kinnibrughs, operate to deny any remedy for their injuries, thus implicating the open courts provision), *superseded by statute*, Civ. Prac. & Rem. §§ 87.001, .003–.005, .0021; *see* House Comm. on Judiciary & Civ. Juris., Bill Analysis, Tex. C.S.H.B. 365, 87th Leg., R.S. (2021) ("[T]he Texas Supreme Court recently ruled that the [Act] does not specifically apply to ranchers and ranch hands. C.S.H.B. 365 would expand the scope of the liability limitation under the [Act] to cover routine and customary activities on a farm, the handling and managing of farm animals, and ranching activities. . . . [The bill] establishes that the [Act] does not affect the applicability of statutory provisions relating to workers' compensation insurance coverage or an employer's ability to refuse to subscribe."). The

13

Kinnibrughs respond that (1) Linda did not raise this challenge in the trial court and thus waived her complaint, and (2) she did not carry her burden to show that she has a cognizable common-law cause of action that the Act restricted arbitrarily or unreasonably.

The open courts provision of the Texas constitution provides that "[a]ll courts shall be open, and every person for an injury done him, in his . . . person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13. The open courts provision "assures that a person bringing a well-established *common-law cause of action* will not suffer unreasonable or arbitrary denial of access to the courts." *Yancy v. United Surgical Partners, Int'l, Inc.*, 236 S.W.3d 778, 783 (Tex. 2007) (emphasis added) (citing *Jennings v. Burgess*, 917 S.W.2d 790, 793 (Tex. 1996)). "A statute has the effect of denying access to the courts if it unreasonably abridges a plaintiff's right to obtain redress for injuries caused by the wrongful acts of another." *Id.* (citing *Sax v. Votteler*, 648 S.W.2d 661, 665 (Tex. 1983)). "Proof of an open courts violation requires two elements: (1) a cognizable, *common-law* claim that is statutorily restricted, and (2) the restriction is unreasonable or arbitrary when balanced against the statute's purpose and basis." *Id.* (emphasis added).

We do not agree that Linda waived her constitutional challenge. Prior to the trial court signing its order, Linda filed a form giving notice of her "Challenge to [the] Constitutionality of a State Statute" in which she alleged that the Act violated the open courts provision. She also raised this issue at the hearing on the Kinnibrughs' motion. In addition, in her petition for permissive appeal, Linda claims in the alternative that if it is determined that the Act applies, it violates the open courts provision. The trial court found that the Act did not apply and certified that ruling for permissive appeal. Thus, Linda's challenge is a "fairly included subsidiary issue[]", and she preserved it for appellate review. *See Boren*

14

*Descendants*, 2026 WL 1108688, at *2 (quoting *Elephant Ins.*, 644 S.W.3d at 147); *see* TEX. R. APP. P. 33.1.

Nevertheless, Linda's open courts challenge fails for two reasons. First, the wrongful death claim that she asserted is a statutory cause of action, which is not available at common law. *See Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 355–56 (Tex. 1990) (rejecting an open courts challenge involving a wrongful death cause of action on this basis). Linda acknowledges this, but asserts that if Richard had not died, he would have been permitted to sue Kyle and the Kinnibrughs for common-law negligence. *See Rose v. Doctors Hosp.*, 801 S.W.2d 841, 845 (Tex. 1990) ("Like all actions based upon theories of negligence, the Roses' cause of action was a common law claim."). But Richard's negligence claim "would have died with [him] had it not been preserved by the legislature in the wrongful death statute." *Id.* (citing CIV. PRAC. & REM. 71.001, *et seq.*). Linda's legal remedy, therefore, is conferred solely by statute, not by the common law. *Id.*

Next, the Act establishes multiple exceptions to its liability bar that could provide a basis for recovery against the Kinnibrughs. *See Waak*, 603 S.W.3d at 117–18 (Blacklock, J., dissenting) (stating that the Act's application to ranch hands would operate to "modestly limit[]" the litigation rights of some injured employees but would not "cut[] them off altogether" because the exceptions to the Act's liability bar could still apply); *Yancy*, 236 S.W.3d at 783 (a statute violates the open courts provision only if it *unreasonably* abridges a plaintiff's right to obtain redress). But, as we explain below, Linda cannot meet this established statutory standard.

Accordingly, we conclude that (1) the open courts provision does not forbid the application of the Act's bar on liability in wrongful death cases, and (2) the Act does not unreasonably abridge Linda's ability to seek a recovery against the Kinnibrughs. *See Rose*, 801 S.W.2d at 845.

15

F. *No Evidence Supports Linda's Gross Negligence Claim and No Statutory Exception Applies to Avoid the Act's Liability Bar*

The Kinnibrughs challenge the trial court's denial of their (1) no-evidence motion for summary judgment on Linda's gross negligence claim, and (2) traditional motion regarding the Act's application. As for the Kinnibrughs' traditional motion, as we have said, the focus of the parties' arguments is the applicability of the exception provided in Section 87.004(4) to the Act's liability bar.

### 1. *Gross Negligence/Wilful or Wanton Disregard Standard*

Under the Act, a person may be liable for damages arising from a death that was caused by a participant in a farm animal activity if "the person committed an act or omission with *wilful or wanton disregard*[7] for the safety of the participant" and that act or omission caused the other to sustain injury. CIV. PRAC. & REM. § 87.004(4) (emphasis added). "[W]illful or wanton disregard" has been defined as "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person . . . to be affected by it." *Wilde*, 728 S.W.3d at 347 (quoting *Little*, 236 S.W.3d at 334). The "willful or wanton disregard" standard requires *actual* subjective awareness of an extreme risk along with deliberate disregard of the risk. *Tarrant Cnty. v. Bonner*, 574 S.W.3d 893, 902 (Tex. 2019). Thus, to meet this standard, it must be shown that the actor had actual subjective awareness of the risk involved, but instead proceeded with conscious indifference to the rights, safety, or welfare of others. *In re Oncor Elec. Delivery Co., LLC*, 716 S.W.3d 525, 532 (Tex. 2025). Although the Act does not define "wilful or wanton," in other contexts the supreme court has, to a degree, compared it to the standard for proving gross

---

[7]The text of the Act uses the spelling "wilful," which is the British variation of the term. *See* BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE: THE AUTHORITY ON GRAMMAR, USAGE, & STYLE 1169 (5th ed. 2022).

negligence.  *See Marsillo v. Dunnick*, 683 S.W.3d 387, 393 (Tex. 2024) (acknowledging that a "willful and wanton" standard is "at least" gross negligence); *see also* CIV. PRAC. & REM. § 41.003 (providing for exemplary damages if a claimant proves gross negligence by clear and convincing evidence).

In *Marsillo*, the supreme court left open the possibility that the "willful and wanton" standard could be higher than the standard for gross negligence and instead reserved this determination "to a future case . . . [to state] the standard's precise contours."  683 S.W.3d at 393.  Because the parties argue that the term "wilful or wanton" as stated in Section 87.004(4) is akin to gross negligence, we do not reach the question of whether there should be a distinction between the two.  Instead, we will confine our analysis of both questions to the well-established gross negligence standard.  In this case, because both questions turn on this single analysis, we conclude, based on the record before us, that (1) Linda failed to produce more than a scintilla of evidence to defeat the Kinnibrughs' no-evidence challenge to her gross negligence claim, and (2) relatedly, no genuine question of material fact exists regarding whether the Kinnibrughs or Kyle acted with "wilful or wanton disregard" for Richard's safety.  *See Goodyear Tire*, 236 S.W.3d at 755; *see also* CIV. PRAC. & REM. § 87.004(4).

Gross negligence is not an independent cause of action; rather, ordinary negligence and gross negligence are "inextricably intertwined"—gross negligence is contingent upon an affirmative finding of ordinary negligence.  *Pecan Valley Mental Health Mental Retardation Region Operating as Pecan Valley Ctrs. for Behav. & Develop. Healthcare v. Doe*, 678 S.W.3d 577, 594 (Tex. App.—Eastland 2023, pet. denied) (citing *Douglas v. Hardy*, 600 S.W.3d 358, 372 (Tex. App.—Tyler 2019, no pet.)).  We note that the Kinnibrughs acknowledge that Kyle's actions could constitute ordinary negligence.  However, this is of no consolation to Linda because, as we have determined, a cause of action for ordinary negligence is

17

expressly excused by the Act and does not defeat the limitation on liability bar. *Wilde*, 728 S.W.3d at 348; *see* CIV. PRAC. & REM. § 87.003.

Unlike ordinary negligence, gross negligence encompasses an objective *and* a subjective component. *See U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 796 (Tex. 2012). To prove gross negligence, both components must be satisfied. Gross negligence is statutorily defined as an act or omission:

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

> (B) of which the actor has *actual*, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

CIV. PRAC. & REM. § 41.001(11) (emphasis added); *see Medina v. Zuniga*, 593 S.W.3d 238, 247 (Tex. 2019); *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014).

For the objective component, "'extreme risk' is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff." *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). With this in mind, we must examine whether the Kinnibrughs' and Kyle's acts or omissions created an extreme degree of risk to Richard—considering the probability and magnitude of the harm. *Goodyear Tire & Rubber Co. v. Rogers*, 538 S.W.3d 637, 645 (Tex. App.—Dallas 2017, pet. denied). For the subjective component, "actual awareness means [that] the defendant knew about the peril, but [his] acts or omission[s] demonstrated that [he] did not care." *Id.* at 646.

Even though ordinary negligence is a prerequisite to obtaining a finding of gross negligence, evidence of ordinary negligence is not sufficient to prove gross negligence. *Waldrip*, 380 S.W.3d at 140. Conduct that is "merely thoughtless,

18

careless, or not inordinately risky" is not tantamount to gross negligence. *Ardoin v. Anheuser-Busch, Inc.*, 267 S.W.3d 498, 503 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex. 1994)). The integral difference between ordinary negligence and gross negligence is the subjective component of the defendant's state of mind. *Louisiana-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 246–47 (Tex. 1999); *see Waldrip*, 380 S.W.3d at 141 ("[A] party cannot be liable for gross negligence when it actually and subjectively believes that circumstances pose no risk to the injured party, even if they are wrong." (citing *Andrade*, 19 S.W.3d at 248)).

Given these guidelines, our analysis requires that we examine all events and circumstances from the actor's perspective at the time the events occurred, without considering hindsight. *Reeder*, 395 S.W.3d at 796; *Ellender*, 968 S.W.2d at 922. We must also consider the employee's (Kyle's) experience. *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 412 (Tex. 2009).

### 2. *Evidence of the Objective Element*

The evidence that Linda asserts equates to gross negligence is derived primarily from Randal's and Kyle's deposition testimony. Randal testified that he heard Richard say "let him up," which is the typical verbal notification to another that a cow is "go[ing] down" in the chute, and it is then "like an automatic, you release the chute." Thus, if someone says "let him up," all who are involved in the vaccination process know that the chute will be released and to be clear of the chute. Randal was adamant that Kyle did not bear any responsibility for Richard's safety, even though Kyle could see through the chute to observe where Richard was located, and he claimed that the accident was "100 percent" Richard's fault. Granted, Randal agreed that if Kyle had not released the chute, Richard would not have died. Randal also conceded that Kyle "probably" could have seen Richard through the chute.

Randal explained how he taught his employees to operate the hydraulic chute:

> The first thing is we go over . . . when everybody learns about a hydraulic squeeze chute, all of the places not to be, all of the -- the moving parts, everything. And then when I am operating that thing, I am looking at the calf. And if the calf goes down and has to be readjusted, we will -- we will operate the sides to let him stand up. And, you know, there is people sometime on the other side . . . we are more interested in the calves. Everything we do around our operation is to take care of cattle. That is what we preach . . . we are humans. We know where to be and where not to be. . . . And so we teach that on those hydraulic chutes.

Randal insisted that there was nothing Kyle could or should have done differently. He disagreed that it was unsafe to release the chute when Kyle did simply because Richard said, "let him up." Randal testified that only Richard could have known if he was clear of the chute at that time, not Kyle, and that "Kyle didn't know that it was unsafe when he operated it." According to Randal, it is safe to release the chute "[w]henever the calf is down" and "all of the time if everyone is where they are supposed to be."

Kyle testified that during the vaccination process he could see Richard through the chute and could have seen if Richard was not clear of it. In response to the question: "What did you do, looking through there at [Richard] when you are standing here, to make sure he was clear of the chute?" Kyle said: "I didn't." Kyle explained that he did not bear any responsibility to look out for Richard's safety because it was "up to the individual to make sure that they are safe and that they are clear" and that he did not "expect [Richard] to be where he was." Like Randal, Kyle agreed that Richard would not have died if he had not released the chute, but he also testified that Richard would not have died if *he* had *not* said "let him up." Kyle testified that when he released the chute he was thinking: "I just thought the calf is down and, you know, you don't want him to die in the chute, or die, period, and that he needs to be up. And I just un-squeezed the chute."

The Kinnibrughs contend that, objectively, no *extreme* risk existed because: (1) Richard was a highly experienced ranch hand, was familiar with the chute's operation and the dangers it could pose, and he knew to be clear of the chute before it was released; (2) the cow's reaction to the chute, Richard "being somewhere [that] he was not supposed to be" when he yelled "let him up," and Kyle releasing the chute's lever before verifying Richard's position, were *inherent* risks that are associated with this farm animal activity; and (3) Richard yelled "let him up," which Richard knew meant that the chute would then be released. *See Garay v. G.R. Birdwell Constr., L.P.*, No. 01-13-01088-CV, 2014 WL 6680347, at *11 (Tex. App.—Houston [1st Dist.] Nov. 25, 2014, no pet.) (holding that evidence that an employee was injured while operating a machine on which he had five years of experience did not involve an extreme risk); *Escoto*, 288 S.W.3d at 412 (stating that an employee's experience should be considered in the gross negligence analysis). Conversely, Linda contends that the operation of the chute is inherently and extremely dangerous and that the Kinnibrughs' conduct, through their employee Kyle, created an extreme risk by failing to require that the chute operator (Kyle) verify that the chute was safe to operate by visually ensuring that others were clear of the chute before it was released.

Here, "everyone," including Richard, was aware of the dangers associated with the hydraulic chute, including the location of the pinch points. Richard and Kyle had operated the chute the same way "thousands" of times. Randal testified that it was safe to release the chute only when everyone was where they should be. The magnitude of the event—death—and the probability of the risk that is created when the chute is released is high if a person is not clear of it as it is being operated, and these were circumstances which both Randal and Kyle appreciated. It was a crucial safety point that everyone should be clear of the chute before it is released.

Randal and Kyle testified that each person is responsible for ensuring their own safety, and Richard—with that knowledge—gave a clear verbal cue to release the chute, which indicated to Kyle that he was clear of the chute. Randal explained that he taught his employees to operate the chute in this manner. Randal stated that it is safe to release the chute "[w]henever the calf is down" and "all of the time if everyone is where they are supposed to be." Kyle testified that he released the chute, consistent with his training and the procedure that he routinely followed. According to Kyle and Randal, Kyle performed his job responsibilities correctly under the circumstances when he released the chute without first verifying if Richard was clear of it, even though Kyle agreed that he could see through the chute and probably would have seen that Richard was not clear of it had he looked.

Kyle, Randal, and Richard were each responsible for their own safety, but only Kyle controlled the operation of the chute. Although "everyone" knew the chute was dangerous, the Kinnibrughs' approach to safety regarding the hydraulic chute expressly assigned no safety responsibility to the chute operator (Kyle), the only person who could engage this mechanism. The probability and magnitude of the potential harm—death—that could result from operating the chute in this manner constitutes an extreme risk that, for summary judgment purposes, is sufficient to support Linda's argument on the objective prong of gross negligence. *See, e.g.*, *Martinez v. Kwas*, 606 S.W.3d 446, 463–64 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (holding that a trucking company created an extreme risk by permitting untrained or unsupervised drivers to haul overweight loads in their dump trucks which significantly limited the drivers' ability to control the vehicles); *Rogers*, 538 S.W.3d at 645 (holding that Goodyear created an extreme risk by failing to take any action to protect its employees from asbestos exposure for eleven years, when the probability of contracting mesothelioma in those conditions was about one in 45,000 and the magnitude of harm was quick and certain death).

### 3. *Evidence of the Subjective Element*

However, the same cannot be said for the subjective prong. With respect to this, the Kinnibrughs contend there is no evidence that Kyle was actually aware that Richard would not be clear of the chute after he yelled "let him up." They also contend that Linda failed to plead or prove any theory that would support imposing vicarious liability on them for Kyle's actions, even if they were grossly negligent. In response, Linda contends that the evidence shows Kyle consciously ignored the appropriate way that he should have operated the chute and, instead, released it without first verifying that Richard was clear of the chute.

Randal and Kyle testified that Richard's verbal cue to "let him up" constituted an "automatic" signal to release the chute, without any further clarification. Kyle agreed that he could see Richard through the bars of the chute while they were vaccinating cattle that day. When asked what he did to ensure that Richard was clear of the chute before he activated it, Kyle answered: "I didn't." Kyle explained that he did not check on Richard's positioning because Randal shows each employee the location of the pinch points and the dangerous areas to avoid; Kyle stated that "ultimately, it is up to the individual to make sure that they are safe and that they are clear." According to Kyle, although he could see through the chute and he knew that Richard was on the other side, he did not verify Richard's location before releasing the chute because "[Kyle] didn't expect him to be where he was." Kyle testified: "I don't know what he was doing there or why he told me to operate -- when you tell somebody to operate a machine or anything and -- it is up to you to make sure that you are out of the way."

Although Kyle clarified that he would not have released the chute if he had seen that Richard was not clear of it, he claimed that he was only doing his job and that Richard was in the wrong place at the wrong time: "it was up to him." Randal and Kyle repeatedly testified that they relied, as they had in the past, on Richard's

23

verbal cue to signal that he was clear of the chute at which time, consistent with their routine, understanding, and experience of having worked with each other for several years, Kyle could then release the chute. Further, Richard understood, as they did, that yelling "let him up" signaled to Kyle to release the chute.

The circumstances in this case show a flawed safety policy that contributed to a tragic outcome. Nonetheless, the same circumstances do not demonstrate that either Kyle, or the Kinnibrughs as his employer, believed or were subjectively aware that the operation of the chute posed a risk to Richard when he yelled "let him up." Instead, they reasonably believed that Richard was clear of the chute when it was released because Richard's verbal cue was a signal to Kyle to release the chute. Furthermore, Richard understood the need to be clear of the chute when it was to be released. *See Andrade*, 19 S.W.3d at 246–47. Thus, based on the record before us, we conclude that Linda did not satisfy the subjective prong of the gross negligence standard.[8]

Viewing the evidence in the light most favorable to Linda, as we must, we conclude that no genuine issue of material fact exists with respect to whether Section 87.004(4) imposes liability on the Kinnibrughs in this case—it does not. *See* TEX. R. CIV. P. 166a(c); *Koopmann*, 547 S.W.3d at 865. Moreover, Linda failed to produce more than a scintilla of evidence to raise a genuine issue of material fact on the subjective prong of gross negligence. TEX. R. CIV. P. 166a(i); *KMS Retail*, 593 S.W.3d at 181. Accordingly, the trial court erred when it denied the Kinnibrughs' motion for summary judgment on traditional and no-evidence grounds.

---

[8]Linda's other arguments in her response to the Kinnibrughs' motion, concerning gross negligence, such as OSHA reporting requirements, the hiring of illegal immigrants, and Kyle's alleged infrequent drug use, are inapplicable, speculative, and constitute no evidence for purposes of our analysis. *See Lozada*, 718 S.W.3d at 266–67 (holding that less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion of a fact." (quoting *King Ranch*, 118 S.W.3d at 751)).

## IV. *This Court's Ruling*

We reverse the order of the trial court, and we render judgment in favor of the Kinnibrughs.

W. STACY TROTTER

JUSTICE

July 2, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.